# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RUCHIKA BHARGO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00626** |
| | ) | **Judge Aleta A. Trauger** |
| **MUSIC CITY CARE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Ruchika Bhargo filed this lawsuit against her former employer, Music City Care, Inc. ("Music City"), asserting a claim of discrimination based on national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § Tenn. Code Ann. § 4-21-401. (*See* Am. Compl., Doc. No. 12.) Now before the court is Music City's Motion for Summary Judgment (Doc. No. 26) which, for the reasons set forth herein, will be granted.

## I.   LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine,

a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.    FACTS AND PROCEDURAL HISTORY

Music City Care is a home health care company with approximately 80 employees. (Am. Compl. ¶ 4; Answer, Doc. No. 15 ¶ 4.) Plaintiff Ruchika Bhargo is a former employee of Music City and a native of India. (*Id.*) She began her employment at Music City on March 7, 2022 as the

Human Resource Manager. (*Id.*)[1] The plaintiff was hired by Music City's former president, Ermias Kassahun, who is of Ethiopian origin.[2] Throughout her employment at Music City, Bhargo had no disciplinary actions against her or performance issues, and no question was ever raised concerning her honesty or integrity. She was suspended on May 2, 2023 and then terminated on May 5, 2023. (Doc. No. 27-4, Bargo Dep. 43–44.)

In the spring of 2023, just prior to Bhargo's termination, Music City experienced instability within the company due to fraud and embezzlement by Kassahun.[3] Kassahun was placed on administrative leave in late April 2023, approximately one week before the plaintiff was terminated. (*Id.* at 34.) Litigation against Kassahun is currently pending in the Chancery Court of Davidson County related to these allegations of financial embezzlement from Music City.

Nega Yilma, a native of Ethiopia and a United States citizen, is Music City's Finance Director. (Doc. No. 27-3, Yilma Dep. 7, 8.) He has held that position since 2017, though his status

---

[1] The defendant purports to dispute this statement on the basis that the Amended Complaint and Answer are not verified. (*See* Def.'s Response to Pl.'s Additional Statement of Facts ("RASF") (Doc. No. 32-1) ¶ 1. But when an answer admits a fact statement in a complaint, that admission is an *admission*, and the fact may be considered as true for purposes of ruling on a motion for summary judgment. *Accord* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). Regardless, these facts are in the record elsewhere and are not seriously disputed by the defendant.

[2] The factual statements for which no citation is provided are drawn directly from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("RSUMF") (Doc. No. 29) or the RASF and are undisputed or undisputed for purposes of the defendant's Motion for Summary Judgment. All facts are viewed in the light most favorable to the plaintiff unless otherwise indicated.

[3] The court observes that the defendant included numerous facts in the "Factual Background" section of its Memorandum of Law in Support of its Motion for Summary Judgment (Doc. No. 27 at 1–6) that are not incorporated in its Statement of Undisputed Material Facts, as a result of which the court cannot readily ascertain whether those facts are (a) supported by the record or (b) disputed. To the extent possible, the court has relied on those facts set forth in the separate factual statements.

has changed from that of independent contractor paid a consultant fee to a salaried employee. (*Id.* at 8–9.) He was still a consultant at the time of the plaintiff's termination. (*Id.* at 19.)

On Saturday, April 29, 2023, Yilma changed the password for the company email and texted the new password to the Executive Director, Angela Benton-Freeman. The internal password change occurred because of Kassahun's falling out with the company. The password included the letters "E-S-T." (*See* Apr. 29, 2023 text messages between Benton-Freeman and Yilma, Doc. No. 27-8 at 1.)

On Tuesday, May 2, 2023, Yilma walked by Bharga in the company hallway and heard her spelling out letters in English on the phone. Yilma heard Bhargo spell out the letters "E," "S," and "T." Immediately after hearing Bhargo spell out these letters on the phone, Yilma sent a text to Benton-Freeman stating:

> Hey Angela
>
> Watch out your office admin
>
> She talking over the phone with him outside office
>
> . . . .
>
> Did u give her the password
>
> For the musiccitycare email
>
> She was telling him a password
>
> I over heard

(May 2, 2023 text messages between Benton-Freeman and Yilma, Doc. No. 27-8 at 2.) Benton-Freeman texted Yilma to ask if he could change the password again. According to the text messages, he did so and told Benton-Freeman not to give it to "her." (*Id.* at 3.) He also asked Benton-Freeman how she could "trust her going forward please be careful." (*Id.* at 4.) He told

Benton-Freeman that he could "be a witness." (*Id.*) Benton-Freeman responded, "I think I will be relieving her of her duties today." (*Id.*)

Yilma also testified that, after overhearing Bhargo in the hallway, he "went down to maintenance" to see if there was a security video recording of the incident, that he watched the video and recorded it on his telephone, and that it confirmed, in his mind, that Bhargo was spelling out the company's email password over the telephone.[4] (Yilma Dep. 21–23.) He also testified that he showed the video to the "office staff, the management" of Music City. (*Id.* at 23.) Yilma testified that he still believes the plaintiff is lying when she says she was spelling out her father's name. (*Id.* at 36.) He stated that his role in the company was to bring what he perceived as a "red flag" to the company's attention. (*Id.*) Investigating was not his role. (*Id.* at 36–37.)

Benton-Freeman agreed that her "internal investigation consisted entirely" of what Yilma told her, and she accepted Yilma's word over that of Bhargo. (Doc. No. 27-1, Benton-Freeman Dep. 28.) She also stated, however, that she asked the person who was with Yilma in the hallway when Yilma overheard Bhargo, Tremaine Franks, whether he had heard anything, but he did not. (*Id.* at 24–25.) And Yilma later told her that he had confirmed by watching the security video that Bhargo had given out the password. (*Id.* at 26–27.) Benton-Freeman testified that she did not view the video until after Bhargo was terminated because she did not have access to it, and she did not interview any other witnesses because there were no other witnesses. (*Id.* at 27.) According to Benton-Freeman, Yilma believed that Bhargo was giving confidential information to Kassahun because Kassahun was the person who had hired Bhargo. (*Id.* at 30.)

The owner and current president of Music City, Selam Sharew (who is also Ethiopian), testified that he had no role in Bhargo's employment—he did not hire her, did not evaluate her,

---

[4] The parties have not introduced the original video or Yilma's copy into evidence.

and was not at the company's office on a day-to-day basis during her employment. (Doc. No. 27-2, Sharew Dep. 6.) Asked about his role in the decision to terminate Bhargo, Sharew responded that, when they met with Kassahun before putting him on administrative leave, he "told us he knew every employee will go with him. He said he is the one hired them and he will take all of them with him. So we said, okay, if anybody can go with you, that's okay, and if for anybody wants to stay here, they can stay." (*Id.*) Ultimately, Kassahun "took like ten clients and some employees." (*Id.* at 7.)

Sometime after that, Yilma, Benton-Freeman, and another employee named Dawn Whidden came to Sharew "about the situation" involving Bhargo. According to Sharew, Yilma told him he "heard [Bhargo] when she pass out the e-mail password for somebody." (*Id.* at 9.) Sharew stated that he, Benton-Freeman, and Whidden made the decision to terminate Bhargo based on this report. (*Id.* at 10.) Benton-Freeman testified that it was a "group decision" among the owners, Yilma, and herself. (Benton-Freeman Dep. 29.)

Bhargo acknowledged that she worked closely with Kassahun on a day-to-day basis and that he was her direct supervisor. (Bhargo Dep. 31) She had access to the company's "password for the main e-mail," but she never had occasion to use it. (*Id.* at 33.) Bhargo received a copy of Music City's Employee Handbook. The Handbook provides that employees who improperly disclose sensitive or confidential information to anyone outside the company may face disciplinary action, up to and including termination. In addition, the Employee Handbook prohibits employees from engaging in "any activities or relationships that create either an actual conflict of interest or the potential for a conflict of interest." (Doc. No. 27-5 at 39.) The Handbook notifies employees that violation of this policy may result in disciplinary action, including termination.

Bhargo denies that she disclosed confidential information or engaged in any activity that created an actual or potential conflict of interest. According to the plaintiff, when Yilma walked by and heard her speaking on the phone, she was talking with a healthcare company trying to make an appointment for her father, and she spelled out her father's name and date of birth in order to make an appointment for him.

Bhargo claims that, when Benton-Freeman called her in to discuss the incident, Benton-Freeman told her that "someone heard [her] passing out the door access code"—not the email password—"to our previous president over the phone." (Bhargo Dep. 43 (quoting EEOC Charge, Doc. No. 31-3, at 1).) In the initial meeting with Benton-Freeman, the plaintiff denied any wrongdoing, insisted she had not been talking to Kassahun, and offered her telephone to Benton-Freeman so she could check her call log, but Benton-Freeman declined to look at Bhargo's phone.

The plaintiff claims she was later "informed" by Dawn Whidden "that management were discussing that [she] was speaking in non-English so they suspected that I was giving out information to previous president who is an Ethiopian." (*Id.* (quoting EEOC Charge, Doc. No. 31-3, at 1); *see id.* at 61–62.) She claims that Whidden told management that Kassahun was Ethiopian and that Bhargo did not speak Kassahun's native language. (Bhargo Dep. 62.)

After Bhargo's termination, she was replaced by an African-American woman. (Benton-Freeman Dep. 54, 56–57.)

The plaintiff filed a timely charge with the EEOC following her termination. (Doc. No. 31-3.) She filed this lawsuit in May 2024, and her Amended Complaint sets forth a single claim of discrimination on the basis of national origin, in violation of both the THRA and Title VII. (Doc. No. 12.) Music City now moves for summary judgment. (Doc. No. 26.) Its motion is supported by a Memorandum of Law and Statement of Undisputed Material Facts. (Doc. Nos. 27, 27-10.) The

plaintiff filed a Response to both (Doc. Nos. 28, 29) and, as noted, an Additional Statement of Facts[5] (Doc. No. 30). The defendant filed its RASF and a Reply. (Doc. Nos. 32, 32-1.)

## III.    LEGAL FRAMEWORK – TITLE VII

A plaintiff may prove a claim of race discrimination in employment, in violation of Title VII,[6] using direct evidence or "circumstantial evidence that creates an inference of discrimination." *Greer*, 2023 WL 9472037, at *3 (citing *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018)). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Peeples*, 891 F.3d at 633 (6th Cir. 2018) (alteration in original) (citation omitted). The plaintiff in this case does not claim to have direct evidence of discrimination.

For claims that rely on indirect, or circumstantial, evidence, courts apply the familiar three-part "*McDonell Douglas*" framework, first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-03 (1973). Under this framework, the plaintiff in a

---

[5] Prior to May 2025, the court's Local Rules authorized a party responding to a summary judgment motion to include with its response to the movant's statement of undisputed material facts a "concise statement of additional facts" that the non-movant believes are both material and disputed. L.R. 56.01(c) (Jan. 24, 2020). As amended in May 2025, the Local Rules no longer authorize such an additional statement of disputed facts. *See* L.R. 56.01(e) (May 15, 2025). The defendant, however, responded to the plaintiff's ASF without objection, so the court has considered it. The court has included in its recitation of the facts those facts in the plaintiff's ASF that appear to be material, except those facts to which the defendant has raised a valid objection under Rule 56(c)(2).

[6] The defendant asserts that the plaintiff's THRA claim must be analyzed identically to the Title VII claim and that it stands or falls with the Title VII claim. (Doc. No. 27 at 13.) The plaintiff's response Memorandum of Law does not address her THRA claim at all. (*See generally* Doc. No. 28.) The defendant is correct; the court, therefore, does not separately address the THRA claim.

Title VII action carries the initial burden of establishing a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified for the position in question, and (4) she was replaced by a non-protected person or was treated differently from a similarly situated, non-protected employee. *Greer*, 2023 WL 9472037, at *3; *Peeples*, 891 F.3d at 634.

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action taken against the employee. *McDonnell Douglas*, 411 U.S. at 802. "The defendant's burden is . . . one of production; not persuasion." *Montgomery v. Honda of Am. Mfg., Inc.*, 47 F. App'x 342, 347 (6th Cir. 2002) (citation omitted).

"Once the employer has come forward with a nondiscriminatory reason for firing the plaintiff, 'the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011)). "Notably, this burden on the plaintiff 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, on summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Id.* (quoting *Provenzano*, 663 F.3d at 812).

## IV. DISCUSSION

### A. The Parties' Arguments

Music City apparently concedes that the plaintiff can establish a *prima facie* case of discrimination, insofar as she belongs to a protected class; she was terminated; she was qualified

for her position; and she was replaced by someone outside her protected class. Music City argues that the plaintiff cannot establish that its proffered nondiscriminatory reason for her termination—suspicion that she had provided confidential information to the former president while he was suspended from the company—was pretext for discrimination. It contends that its reason had a basis in fact, that its decisionmakers had an honest belief in Yilma's claim that he had overheard Bhargo giving out the password to someone on the telephone, that its "confidentiality concerns" actually motivated the decision to terminate Bhargo, and that these concerns were sufficient to warrant termination. (Doc. No. 27 at 10–13.)

The plaintiff argues in response that it is undisputed, for purposes of summary judgment, that she did not actually give out the company's password to Kassahun or anyone else and that the company's belief that she did was supported by nothing more than Yilma's speculation. She asserts that even a minimal investigation—such as looking at her telephone call log—would have conclusively refuted Yilma's allegations. She also argues that the company's "inconsistent positions" is further evidence of pretext. (Doc. No. 28 at 9.) More specifically, she claims that she was initially told by Benton-Freeman and then by Whidden that Yilma had heard her in the hallway "speaking a foreign language" and that she had given out the door code, but that Music City has now taken the position that Yilma only heard her speaking in English and giving out the email passcode. (*Id.* at 9–10.) In its Reply, the defendant maintains that it is undisputed that Bhargo's native language—and therefore her national origin—had nothing to do with her termination. (Doc. No. 32.)

### B. The Plaintiff Cannot Establish Pretext

"Unlike the showing at the *prima facie* stage, the burden at the pretext stage is onerous: plaintiffs must demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination or retaliation." *Beny v. Univ. of Mich.*, No. 24-1674, 2025 WL

2124175, at *8 (6th Cir. July 29, 2025) (internal quotation marks and citations omitted), *cert. denied*, 146 S. Ct. 829 (2025). Generally, a plaintiff can "show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

The plaintiff here first asserts that the proffered reason had "no basis in fact." A challenge on this ground is "essentially an attack on the credibility of the employer's proffered reason . . . [and] consists of showing that the employer did not actually have cause to take adverse action against the employee based on its proffered reason, and thus, that the proffered reason is pretextual." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). However, "[w]here the employer can demonstrate an honest belief in its proffered reason, . . . the inference of pretext is not warranted." *Id.* To address this situation, the Sixth Circuit has adopted the "honest belief rule." *Id.*

When a defendant, as Music City does here, relies on the honest belief rule, the plaintiff must "show more than a dispute over the facts upon which the discharge was based." *Id.* (citation omitted). As the Sixth Circuit has explained, it does not

> require[] that the employer's decision-making process under scrutiny be optimal or that it [leave] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. Furthermore, the falsity of a defendant's reason for terminating a plaintiff cannot establish pretext as a matter of law under the honest belief rule. As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.

*Id.* at 285–86 (internal quotation marks, brackets, and citations omitted); *see also Chen*, 580 F.3d at 401 ("When an employer reasonably and honestly relies on particularized facts in making an

employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" (citation omitted)).

The plaintiff argues that the defendant is not entitled to application of the honest belief rule, because Yilma's claim that she was giving out the email passcode to Kassahun was based on nothing more than rank speculation, and "[e]ven a cursory investigation"—such as speaking with the plaintiff or looking at her telephone log—would have "proven unequivocally" that she had not been speaking to Kassahun on the phone. (Doc. No. 29 at 8.) She also asserts that the other witness, Tremaine Parks, did not "hear anything" and that Benton-Freeman did not "make any effort to even watch" the security video. (*Id.* at 9.) She claims that the decisionmakers simply, and unreasonably, decided to accept Yilma's "unfounded and unproven accusations" over the plaintiff's denial of wrongdoing and that, consequently, Music City cannot "demonstrate a reasonable reliance on a particularized set of facts to warrant the termination." (*Id.*)

The particularized facts at issue here are that Music City had been "destabilized" by the company's president's very recent suspension on suspicion of embezzlement from the company and that, upon his departure, he threatened to take clients and employees with him. The plaintiff was known to have been hired by, and to have worked closely with, Kassahun. Benton-Freeman was told by Yilma, whom she had no reason to disbelieve, that he had overheard the plaintiff giving out the email password he had just changed to someone over the telephone. Yilma later told Benton-Freeman that he had confirmed what he had heard by watching the security video. Benton-Freeman discussed these allegations with the owner, Sharew, and the decision was made to terminate the plaintiff based on Yilma's allegations.

While the decision, in retrospect, clearly appears to have been mistaken and baseless, nothing in the record suggests that Yilma did not honestly believe that he heard the plaintiff giving

out the just-changed password or that Benton-Freeman and Sharew did not believe his report. With respect to the plaintiff's assertion that the defendant should have conducted a more thorough investigation, as set forth above, the defendant is not required to show that it conducted "an 'optimal' investigation," and proof that it "interview[ed] the employee and some or all of his witnesses . . . is not a prerequisite to application of the honest belief rule." *Seeger*, 681 F.3d at 286. Even the fact that the plaintiff was a "reliable employee with a good employment record is not relevant," because it proves nothing other than that, absent misconduct on her part, the defendant was "unlikely to terminate [her] employment." *Id.* at 286.

Finally, the plaintiff's claim that the defendant's reason for her termination has shifted is not supported by the record. The plaintiff understood Benton-Freeman as telling her that "someone heard [her] passing out the door access code to our previous president over the phone." (Bhargo Dep. 42; EEOC Charge, Doc. No. 31-3 at 1.) But Yilma's text to Benton-Freeman referenced the password for "the musiccitycare email" (*see* Doc. No. 27-8 at 2), and he testified unequivocally that the only code at issue was the email password, that there "is no other password." (Yilma Dep. 32.) Benton-Freeman recalled that Yilma "just said password" and that she initially "assumed it was the door passcode," but "it was clarified once he talked to [her] that it was the e-mail password." (Benton-Freeman Dep. 22.) Any reference to a door passcode appears to have been a simple error on Benton-Freeman's part.

Yilma testified that he did not hear the plaintiff speaking a foreign language (Yilma Dep. 20); Benton-Freeman agrees that Yilma said nothing about Bhargo speaking a "foreign" language (Benton-Freeman Dep. 23); and Yilma's texts to Benton-Freeman substantiate that assertion (Doc. No. 27-8 at 2). Moreover, notably, Yilma (like Kassahun) is Ethiopian, and English is his second language. (Yilma Dep. 32, 34.) He knew that Bhargo was not Ethiopian (see id. at 34), and it seems

fairly obvious that, if Bhargo had been speaking Ethiopian to someone on the telephone, Yilma would have understood her. The plaintiff's claims about what other employees later told her amount to unsubstantiated hearsay, and the plaintiff has not shown that this hearsay can be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

In sum, no evidence in the record supports the plaintiff's claim that her termination was based on her having been heard speaking a "foreign language" in the hallway. The defendant's honest belief that the plaintiff was giving out the company's email password to someone on the telephone was reasonably based on particularized facts, and the plaintiff has not presented sufficient facts from which a jury could conclude, by a preponderance of the evidence, that the defendant's reason for terminating her was pretextual and that the real reason was discrimination based on her national origin.

## V. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 26) will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge